IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

CSX Transportation, Inc.,                               Case No. 3:04CV7308

           Plaintiff

         v.                                                 ORDER

Exxon/Mobil Oil Corp.,

           Defendant

This is a suit for negligence and indemnity. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a)(1).

The plaintiff CSX Transportation, Inc. (CSX) is a railroad. The defendant Exxon/Mobil Oil Corp. (Exxon) shipped a tank car from its facility in Baytown, Texas. The morning after the car arrived at the CSX Stanley Yard in Walbridge, Ohio, its contents, automatic transmission fluid, were seen "gushing" out of the outlet spout on the car's bottom.

Through this suit, CSX seeks $300,000 to cover the cost of cleaning the spill. CSX contends that Exxon failed either to secure the tank car's load or inspect the car to make sure that load was properly secured. Exxon seeks summary judgment at to plaintiff's claims. For the following reasons, I shall grant Exxon's motion for summary judgment without reaching the issue of whether to strike the affidavit.

**Background**

Exxon inbound inspector Bryan Louque inspected tank car HPLX-351146 on its arrival at Exxon's Baytown facility on May 7, 2002. His inspection checklist noted no leaks or problems on the car's underside. Exxon technician Warren Franklin inspected and loaded the car with the

transmission fluid on May 10, 2002. Franklin also documented his inspection and indicated that the tank car did not have any leaks or problems.

The car left Baytown May 10, 2002, on the Union Pacific Railroad. On May 22, 2002, the tank car arrived at Stanley Yard, where it passed visual inspection by a CSX employee. On May 23, 2002, at about 11 a.m., CSX employee Steve Helton noticed the "gushing" of the fluid from the outlet spout. The parties agree that the leak occurred that morning, shortly before Helton spotted the spill, and not earlier.[1]

For a tank car's contents to empty, the "belly cap" cover on the bottom of the outlet must be off, a pin holding the lever that opens and closes the outlet must not be present, and the discharge lever must be in the open position.

At the time of the spill, the tank car's belly cap was missing, the release pin was out of its hole, and the release handle was in the down, or open, position. The belly cap was never found. The release pin hole on the tank car was larger than normal.

Exxon contends that its workers properly loaded the tank car and secured the belly cap. As evidence that they properly installed the belly cap, Exxon provides deposition testimony from Franklin and Louque and two business records: Louque's May 7, 2002, Tank Car Pre-Shipment Mechanical Inspection Checklist; and Franklin's May 10, 2002, Tank Car Loader's Checklist. Both checklists indicate that Exxon employees properly inspected the tank car and determined that there were no defects on the belly cap.

---

[1] They agree because, *inter alia*, there was no evidence of the leak in other parts of the yard and the entire contents of the tank car had not emptied by the time a CSX employee stopped the leak. The tank car would have been completely empty of transmission fluid if it had leaked for a longer period of time. By the same token, CSX employees also would have found a trail of transmission fluid from the different places the tank car had been in the Stanley Yard if it had begun leaking earlier.

In addition to the checklists, both also testified that they properly inspected and loaded the tank car and it was without defects when they did so.

CSX supports its claims with an affidavit by railroad operations expert Foster Peterson who (albeit without much clarity) places responsibility for securing the belly cap on Exxon.[2] His affidavit states that "[s]hippers are required to load and secure loads to withstand the normal vagaries of rail transport." (F. Peterson Aff. ¶ 4.) The affidavit states that "inbound car inspectors" are not required to inspect cars for "defects to appurtenances" such as the belly cap. (*Id.* at ¶¶ 5-7.)

The affidavit lists three possible causes for the incident:  1)  the belly cap was never installed; 2) the belly cap was installed improperly, causing the cap to become loose in transit and then detach; and 3) vandalism. (*Id.* at 10.) Peterson stated he believed vandalism was unlikely because, *inter alia*, a vandal would need both knowledge of how the belly cap operates and the proper tools to remove the cap. (*Id.* at ¶¶ 11-13.)

The affidavit never mentions Exxon by name, but refers to the responsibilities of "shippers." (F. Peterson Aff. ¶¶ 4-6.) Indeed, the affidavit does not explicitly state that Peterson believes, in reference to his list of three possible causes of the incident, that *Exxon* either failed to affix the belly cap or affixed it improperly. (*Id.* at ¶ 10.) The affidavit instead simply states that "shippers" "use" belly caps in loading tank cars. (*Id.* at ¶¶ 5-6.)[3]

---

[2] Exxon has moved under Fed. R. Civ. P. 12(f) to strike the Peterson affidavit. It contends that the affidavit violates the rule that expert testimony must be stated with a reasonable degree of professional certainty. Because Exxon's motion for summary judgment prevails whether the Peterson affidavit is considered or not, no ruling shall be made on the merits of its motion to strike.

[3] Exxon was responsible for installing and securing the belly cap. It is an open question (and I do not determine) whether Exxon was the only entity responsible for inspecting the belly cap to check for defects.

3

CSX argues that one could infer from the Peterson affidavit that Exxon was at fault for the leak because the affidavit refers to the responsibilities of shippers and Exxon is the only "shipper." Under this argument, Union Pacific Railroad and CSX were "carriers." Exxon disagrees.

The affidavit does not explain the relevant standard of care or explicitly indicate that Exxon breached that standard. The affidavit only makes general statements about the duties of shippers and inbound inspectors, without identifying the entities that filled those roles in this case.

## Analysis

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). In viewing the evidence, I must draw all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 248 (1986); *Best v. Cyrus*, 310 F.3d 932, 934 (6th Cir. 2002); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Bell v. Marinko*, 367 F.3d 588, 591 (6th Cir. 2004)  (citing  *Shah v. Deaconess Hosp.*, 355 F.3d 496, 498 (6th Cir. 2004)).

### 1. Evidentiary Issues

To be admissible under the business records exception to the hearsay rule, Fed. R. Evid. 803(6), a document must have been 1) made in the course of a regularly conducted business activity and 2) kept in the regular course of that business. In addition, 3) the regular practice of the business

must have been to make the document, and 4) it must have been made by a person with knowledge of the transaction or from information transmitted by a person with knowledge at or near the time the event occurred. *United States v. Jenkins*, 345 F.3d 928, 935 (6th Cir. 2003). A party may show the elements of a business record by testimony of the custodian of the records, which means that neither testimony from the original author of the record nor reliance on the memory of the record's author are necessary. Fed. R. Evid. 803(6).

The two checklists prepared by Exxon's employees meet the requirements Rule 803(6). The checklists were made in the course of their regularly conducted activities, made when they had knowledge of those activities, and kept in the normal course of performing Exxon's business activities – namely, loading and shipping tank cars with transmission fluid. There is no question that Exxon kept the checklists as records.

The matters asserted in the records – the performing of inspections and observations made during the inspections, is admissible under Fed. R. Evid. 406 as proof of habit or routine practice. Fed. R. Evid. 406.[4]

Franklin and Louque in particular and Exxon employees in general routinely inspected and secured tank car belly caps. The witnesses testified that they followed the same procedure for every

---

[4] Rule 406 states:

> Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Fed. R. Evid. 406

tank car. Their testimony as to their routine practices as Exxon employees is admissible for the truth of the matter asserted: i.e., no defects were observed or observable.

## 2. Negligence and *Res Ipsa Loquitur*

Under Ohio law, a plaintiff suing for negligence must show: 1) the existence of a duty; 2) breach of that duty by defendant; 3) proximate cause between the breach and damage to the plaintiff; 4) damage to the plaintiff. *Mussivand v. David*, 45 Ohio St. 3d 314, 318 (1989).[5]

CSX offers no evidence explaining specifically how Exxon breached any duty. The Peterson affidavit, which merely speaks in terms of possible causes, is not evidence that Franklin and/or Louque failed to inspect and secure the tank car's belly cap.

CSX contends that it can satisfy the second element of its negligence claim by invoking the doctrine of *res ipsa loquitur*, which permits a jury to draw an inference of negligence without evidence of specifically how defendant allegedly breached a duty owed to the plaintiff. *Krupar v. Proctor & Gamble*, 160 Ohio St. 489, 493 (1954). To invoke *res ipsa loquitur*, plaintiff must satisfy two elements:

> For the application of the doctrine of *res ipsa loquitur* to apply, "a plaintiff must adduce evidence in support of two conclusions: (1) that the instrumentality causing the injury was, at the time of the injury, or at the time of the creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed."

*E.g., Eannottie v. Carriage Inn of Steubenville*, 155 Ohio App. 3d 57, 66 (Ct. App. 2003).

*Res ipsa loquitur* shifts the burden of proof to defendant when the facts of alleged negligence are solely within the defendant's knowledge because, *inter alia*, of defendant's exclusive control of

---

[5] I need not reach the issue of whether CSX has satisfied the third element of the claim – proximate causation – because I find the second element lacking.

the instrumentality that caused the harm. *Kemper v. Builder's Square, Inc.*, 109 Ohio App. 3d 127, 137 (Ct. App. 1996). Plaintiff must establish both elements to enable a jury to "draw an inference of negligence" without evidence of a specific breach of duty by defendant. *See Kniskern v. Somerford Twp.*, 112 Ohio App. 3d 189, 193 (Ct. App. 1996); *Sun Ins., Inc. v. Edwards*, 97 Ohio App. 3d 239, 241 (Ct. App. 1994).

### A. Exclusive Control

The first element of the test – exclusive control of the instrumentality that caused the harm – means that the doctrine of *res ipsa loquitur* is inappropriate where the act or object causing the injury is not under the control and management of the defendant. *Norman v. Thomas Emery's Sons, Inc.*, 7 Ohio App.2d 41, 44 (Ct. App. 1996). The doctrine is inapplicable if facts indicate the injury may have been due to some force beyond the control of the defendant. *Cleveland R.R. Co. v. Sutherland*, 115 Ohio St. 262, 265 (1926).

If the instrumentality that caused the injury was used, managed, or controlled by several different actors, then a court cannot draw the inference that the harm resulted from one particular actor's negligence and, therefore, *res ipsa loquitur* is inappropriate. *Oberlin v. Friedman*, 5 Ohio St. 2d 1, 9 (1965); *Eannottie v. Carriage Inn of Steubenville*, 155 Ohio App. 3d 57, 66 (Ct. App. 2003).

A court does not determine whether a defendant had exclusive control of the instrumentality that caused the harm based solely on defendant's possession of the instrumentality: it also considers "practical considerations of management and control." *Domany v. Otis Elevator Co.*, 369 F.2d 604, 614 (6th Cir. 1966). Invocation of *res ipsa loquitur* is possible even if defendant lacked "continuing"

exclusive control of the instrumentality so long as there was "no intervening control" of that instrumentality. *Id.*

If the instrumentality was beyond defendant's exclusive control for a period of time, however, the plaintiff must show that: 1) the instrumentality was not handled or tampered with since leaving defendant's control and 2) it is highly improbable that any other force or action affected the instrumentality. *Cusumano v. Pepsi-Cola Bottling Co.*, 9 Ohio App. 2d 105, 109 (Ct. App. 1967) ("in cases where there was a possibility of another force intervening, the courts [have been] strict in their findings that [exclusive] 'control' had not been established").

In some situations, courts require plaintiff to allege that the instrumentality could not have been mishandled or tampered while beyond defendant's control. *Ramsey v. Del Monte Corp.*, 9 Ohio App. 3d 103, 104 (Ct. App. 1983) (holding that, in an exploding bottle case, "if the defendant did not have possession [of the instrumentality] at the time of the injury, there must be an allegation that the instrumentality could not have been mishandled or tampered with at those times when it was out of the possession and control of the defendant").

CSX cannot satisfy the first part of *res ipsa loquitur* standard: the instrumentality that caused the harm – the tank car and its appurtenances – was not in Exxon's exclusive control. CSX has shown neither that the tank car was not tampered with after leaving Exxon's control nor that it is improbable that some other force affected the tank car.

The tank car was, indeed, handled by others – at the very least by the CSX employees who inspected the car on its arrival at the Stanley Yard and later plugged the leak when the spill was discovered. The tank car was not in Exxon's control when it was transported on Union Pacific Railroad for thirteen days and then kept at the Stanley Yard for eighteen hours before the spill.

8

CSX argues that *res ipsa loquitur* is appropriate because the "instrumentality" was actually a "procedure." The "procedure" in question, CSX contends, was the installation, securing, and inspection of the belly cap, a process in Exxon's exclusive control. CSX, in short, states that this element of *res ipsa loquitur* is met because Exxon had exclusive control of the tank car when the belly cap was or was not properly secured.

Here, however, the instrumentality at issue is the tank car, not the "procedure" of installing and securing the belly cap. The relevant time frame for the issue of exclusive control is not simply when the belly cap was installed. That event, occurring eighteen days before the spill occurred, overlooks other potential causes of damage to the tank car that might have occurred after the car left Exxon's premises and control.

CSX correctly notes that some Ohio courts have held that the defendant's exclusive control of the instrumentality of the harm need not have been continuous so long as the exclusive control was "at the time of the creation of the condition causing the injury."

In this case, no one can state the "time of the creation of the condition causing the injury." CSX argues that the time in question was when Exxon loaded the tank car. But no evidence supports that contention. The Peterson affidavit is not proof that the procedure of installing the belly cap, or alleged failure to do so, created the harm. The affidavit merely speaks in terms of possible causes and not in terms of specific acts of negligence on Exxon's part that breached the duty owed others.

On the other hand, Exxon has provided its business records and supportive deposition testimony showing that it properly loaded and secured the tank car. CSX has not provided any specific evidence that counters Exxon's business records and testimony.

9

The Peterson affidavit does not negate Exxon's direct evidence that its employees properly installed the belly cap. Indeed, the affidavit speaks only in general terms of "shippers" and "inbound carriers" and does not describe the proper standard of care for the industry. The Peterson affidavit did not conclude that Exxon had exclusive control of the car. In any event, such contention would have no factual basis.

Exxon was in charge of first installing, securing, and inspecting the belly cap, but had no control over the tank car after that time. Any number of individuals may have come into contact with the tank car and, intentionally or not, done something that contributed to the spill. Something may have occurred en route and damaged the belly cap. Given its undisputed evidence that the cap was secured, and properly so, before leaving its control, Exxon does not have the burden of identifying other individuals and actions that may have damaged the tank car or otherwise caused the spill.

CSX cannot meet the first element of the test for *res ipsa loquitur*: namely, Exxon's exclusive control of the instrumentality causing the harm. CSX, accordingly, cannot meet its burden of showing negligence on Exxon's part via *res ipsa loquitur*. Without *res ipsa loquitur*, the negligence claim fails because CSX cannot show specific acts by Exxon that breached a duty of care.

### B. Unusual Circumstances that Point Only to the Defendant

Even if, however, I were to find that CSX had Exxon's exclusive control over the condition causing the spill, its negligence claim would still fail because the second element also is lacking.

The second element of the *res ipsa loquitur* standard is that the harm occur under unusual or unlikely circumstances. *St. Marys Gas Co. v. Brodbeck*, 114 Ohio St. 423, 433 (1926). This requirement is justified because, in cases involving unusual circumstances, an inference that the accident resulted from negligence by the person controlling the instrumentality that caused the harm is generally the only reasonable possibility. *Id.*

A plaintiff invoking *res ipsa loquitur*, therefore, must show that the circumstances of the injury were so unusual that the particular type of harm normally would not have occurred absent negligence by someone in defendant's position. *Schafer v. Wells*, 171 Ohio St. 506, 506-07 (1961) (invoking *res ipsa loquitur* where, after a repairman installed a new burner in a furnace, lit the furnace, and left the premises; a fire broke out an hour later in the furnace room, and no one else had entered the furnace room in the interim). The doctrine, accordingly, does not apply if facts show a force beyond defendant's control may have caused the harm. *Cleveland R.R. Co. v. Sutherland*, 115 Ohio St. 262, 265 (1926).

Although the spontaneous leak from the tank car's belly cap was unusual, the circumstances of the spill do not automatically lead to the conclusion that only Exxon could have been responsible.

Other reasonable theories – ones that do not implicate negligence on the part of Exxon – exist as to the possible cause of the spill, such as damage to the belly cap en route from Texas and vandalism after its arrival at the Stanley Yard. This being so, CSX cannot satisfy the second element of the *res ipsa loquitur* standard.

### 3. Indemnification

CSX also claims entitlement to indemnification for the costs of remediating the spill.

Courts recognize implied contracts of indemnity if a person is secondarily liable due to a relationship to another party and is forced to pay damages. *Reynolds v. Phys. Ins. Co. of Ohio*, 623 Ohio St. 14, 16 (1993). In such situations, the secondarily liable party may recoup his entire loss from the party actually at fault and causing the injuries. *Id.*

To recover on an implied contract for indemnification, CSX has to show that Exxon caused the spill and subsequent expenditure by CSX. As discussed above, CSX cannot show that Exxon caused the spill. Thus Exxon does not have to indemnify CSX for the damage suffered by CSX.

## Conclusion

CSX cannot invoke *res ipsa loquitur* to satisfy the second element of its negligence claim – breach of a duty of care. Thus it cannot recover on any of its theories of liability.

It is therefore,

ORDERED that defendant Exxon's motion for summary judgment be, and the same hereby is, granted; defendant's motion to strike is overruled as moot.

So ordered.

/s/James G. Carr
James G. Carr
Chief Judge